UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DAIVIONTAE TYRELL JOHNSON,

                              Plaintiff,

        v.                                              Case No. 22-cv-849-pp

BENJAMIN RUSCH
and TREVOR TRELLO,

                              Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 31) AND DISMISSING CASE

        Plaintiff Daiviontae Tyrell Johnson, who is representing himself, is proceeding under 42 U.S.C. §1983 on a Fourteenth Amendment claim against correctional officers at the Racine County Jail. The defendants have moved for summary judgment. Dkt. No. 31. The court finds that the defendants are entitled to judgment as a matter of law, grants the defendants' motion and dismisses the case.

## I.    Facts

### A.    Procedural Background

        On July 26, 2022, the court received the plaintiff's complaint asserting claims against officials at the jail. Dkt. No. 1. On November 2, 2022, the court screened the complaint, concluded that the complaint did not state a viable claim and gave the plaintiff an opportunity to file an amended complaint. Dkt. No. 15. The court received the amended complaint on November 11, 2022. Dkt. No. 16. The court screened the amended complaint and allowed the plaintiff to proceed on a claim that two correctional officers at the jail (identified as C.O.

Rush and C.O. Trello) "sprayed him with OC spray (presumably oleoresin capsicum spray, a chemical inflammatory) despite him telling them that he has asthma." Dkt. No. 17 at 6–7.

On February 27, 2023, the court issued a scheduling order setting an August 23, 2023 deadline for the parties to file motions for summary judgment. Dkt. No. 22. On June 23, 2023, the court received the defendants' summary judgment motion. Dkt. No. 31. On June 26, 2023, the court issued an order directing the plaintiff to respond to the defendants' motion by July 24, 2023. Dkt. No. 37. The court explained that the plaintiff must respond to the defendants' proposed facts "either by agreeing with the proposed fact or explaining why he disagrees with the proposed fact." Id. at 1. The court told the plaintiff that he "must support every disagreement with a proposed fact by citing to evidence." Id. The court explained that the plaintiff could support his disagreements "by relying on documents that he attaches to his response or by telling the court his version of what happened in an affidavit or an unsworn declaration under 28 U.S.C. §1746." Id. at 1–2.

The court granted the plaintiff's two motions for an extension of his deadline to respond to the defendants' motion. Dkt. Nos. 43, 47. On August 31, 2023, the court received the plaintiff's response materials. Dkt. Nos. 49–50.

B. <u>Factual Background</u>

1. *The Amended Complaint*

Because the amended complaint is verified, the court will treat it as "the equivalent of an affidavit" for purposes of this decision. <u>Devbrow v. Gallegos</u>, 735 F.3d 584, 587 (7th Cir. 2013). The amended complaint alleges that on December 2, 2021, while the plaintiff was in segregated housing at the jail, another incarcerated person attacked him. Dkt. No. 16 at 2. He alleges that

Officers Rusch and Trello "responded to the attack, but as they were responding, 'CO Rush sprayed [the plaintiff] in the face and eyes with OC spray despite [the plaintiff] telling them "I have ast[h]ma don[']t spray me.""" Dkt. No. 17 at 3 (quoting Dkt. No. 16 at 2). The amended complaint alleges that the plaintiff suffers from asthma and that both officers knew that at the time of the incident because he "always saw the nurse for [his] inhaler." Dkt. No. 16 at 3. The plaintiff reiterates that the officers sprayed him "right in the eyes" despite him imploring them not to use the spray because of his "bad ast[h]ma." Id.

The court screened the amended complaint and allowed the plaintiff to proceed on a Fourteenth Amendment claim that by spraying the plaintiff despite knowing he has asthma, the officers used excessive force. Dkt. No. 17 at 7. The court explained that "[t]he officers had a non-punitive reason for spraying the plaintiff and the attacking incarcerated person with the chemical spray—they believed the two incarcerated persons were fighting." Id. But the court observed that if the plaintiff "told the officers he had asthma, and [if] they knew beforehand that he is asthmatic, the officers *may* have acted with reckless disregard for the consequences of their actions by spraying the plaintiff." Id. (emphasis in original). The court did not allow the plaintiff to proceed on a claim that Officer Trello failed to protect him from the attack or that he violated jail policy. Id. at 5.

### 2.  *Defendants' Proposed Facts*

The plaintiff filed a response to the defendants' proposed facts, in which he disputes many of those facts. Dkt. No. 50. But he failed to support most of those disagreements by citing evidence in the record, as the court had instructed him to do. Dkt. No. 37. The plaintiff's failure to support his disagreements with the defendants' proposed facts by citing evidence in the

3

record violates the court's previous order and the court's Local Rules. See Civil Local Rule 56(b)(2)(B) (E.D. Wis.). Where the plaintiff fails to support a factual dispute by citing evidence, the court will deem the fact admitted for purposes of this decision. See Civil L.R. 56(b)(4); Smith v. Lamz, 321 F.3d 680, 683 (7th Cir. 2003) ("[A] failure to respond by the nonmovant as mandated by the local rules results in an admission."). That means the court will consider the defendants' undisputed facts to be true, so long as the defendants support them by citing evidence in the record. See Fed. R. Civ. P. 56(e)(2).

a.    The Plaintiff's Medical Records

The plaintiff was booked into the jail on July 3, 2021. Dkt. No. 32 at ¶7; Dkt. No. 34-1 at 1. The plaintiff underwent a medical screening, during which he reported that he suffers from asthma. Dkt. No. 32 at ¶8; Dkt. No. 34-2 at 1, 6. But the plaintiff did not report taking any medication for asthma. Dkt. No. 34-2 at 1, 6. From November 28, 2021 through December 6, 202, the jail prescribed the plaintiff acetaminophen. Dkt. No. 32 at ¶9; Dkt. No. 34-3. While he was incarcerated at the jail, the jail staff did not prescribe the plaintiff an inhaler or any other medication for asthma. Dkt. No. 32 at ¶10.

The plaintiff claims that he "was prescribe[d] other medication," but he does not say what those medications were. Dkt. No. 50 at ¶9. He claims the Florida Department of Corrections faxed his medical records to the Racine County Jail, and he says those records show that he suffers from asthma. Id. at ¶10. The plaintiff cites documents 308 and 280 from his attached exhibits. Id. Document 280 is not in the plaintiff's attachments, and document 308 is the cover letter for the plaintiff's medical record release from the Florida Department of Corrections. Dkt. No. 49-1 at 14. This document says only that

the plaintiff's medical records have been sent; it says nothing about the contents of those records. Id.

The plaintiff also attached a "Narrative Progress Note" from April 18, 2019. Dkt. No. 49-1 at 3. The note states: "Pt. states to having asthma, but doesn't take anything yet. Pt. was started on peak flow x3 with resp. assessment." Id. The plaintiff does not say where he was incarcerated when this note was created, and the form does not state a location. He also attached a medical screening form from July 11, 2022, which shows that the plaintiff received albuterol for his asthma as of that date. Id. at 4. This form does not state the location where the screening was performed.

b.     December 2, 2021

On December 2, 2021, corrections officers Benjamin Rusch and Trevor Trello (identified as C.O. Rush and C.O. Trello in the amended complaint) were working for the Racine County Sheriff's Office and were assigned to the D-wing at the jail. Dkt. No. 32, ¶¶11–12.

At 5:15 p.m., incarcerated person Larvizo Brown entered the third-floor common area segregation unit on D-wing. Id. at ¶13. Brown was able to access the common area because a door had been propped open without jail staff's knowledge. Id. at ¶14. The plaintiff was in the same common area, and Trello was attempting to pass the plaintiff his dinner meal tray. Id. at ¶15. The plaintiff and Brown began to argue. Id. at ¶16. Trello ordered Brown to return to Brown's unit and lock down, but Brown refused and continued to argue with the plaintiff. Id. at ¶17. Trello called for assistance from other D-wing officers. Id. at ¶18. Brown grabbed a mop bucket, and the plaintiff grabbed a mop. Id. at ¶19. Rusch arrived in the common area as Trello was ordering the plaintiff and Brown to stand down and return to their dayroom areas. Id. at ¶¶20–21.

Neither the plaintiff or Brown followed those orders; Brown threw the mop bucket at the plaintiff, and the plaintiff began to swing the mop handle at Brown. Id. at ¶¶22–24. They continued to fight and refuse Trello's orders. Id. at ¶25.

At approximately 5:18 p.m., Rusch sprayed "a one second burst" of Oleoresin Capsicum (OC) spray at Brown and the plaintiff through the food slot into the common area, hitting them on the sides of their bodies. Dkt. No. 34-4 at 1; Dkt. No. 32 at ¶26. The spray appeared ineffective, and the plaintiff and Brown continued to fight. Dkt. No. 32 at ¶27. Rusch again used the OC spray, which hit Brown in the back. Id.; Dkt. No. 34-3 at 4. Rusch and Trello continued to order Brown and the plaintiff to stop fighting, but they ignored those orders and continued to fight. Dkt. No. 32 at ¶28. The plaintiff says that at some point he "informed staff don[']t spray I have asthma," but he was still sprayed and "couldn[']t breath[e]." Dkt. No. 50 at ¶26. He cites no evidence in support of this statement.

At 5:19 p.m., Rusch attempted to use the OC spray a third time, but the can was empty. Dkt. No. 32 at ¶29. Rusch retrieved a separate canister of OC spray and gave it to Officer Trello. Id. at ¶30. According to an incident report, the plaintiff attempted to stop fighting and "get away" from Brown, but Brown was holding the plaintiff's arm and would not let him go. Dkt. No. 34-4 at 4. Brown began hitting the plaintiff with a closed fist and did not let him get away. Id. Other officers joined Trello at the door to the common area. Dkt. No. 32 at ¶30. Trello used the new can of OC spray at 5:20 p.m., hitting Brown in the back. Id. at ¶31. When the plaintiff and Brown still refused to stop fighting, Trello used the OC spray a second time, this time hitting Brown in the face. Id. at ¶32; Dkt. No. 34-4 at 4. This final spray ended the fight, and Brown and the

plaintiff separated. Id.; Dkt. No. 32 at ¶32. The plaintiff returned to his assigned dayroom, and Brown continued to walk around the common area. Dkt. No. 34-4 at 4. The plaintiff says he told another officer (not Rusch or Trello) that he could not breathe and that his face was "redish [*sic*] purple." Dkt. No. 50 at ¶33. He again cites no evidence in support of this contention.

Jail officers secured Brown and the plaintiff in their cells. Dkt. No. 32 at ¶34. At approximately 5:36 p.m., a Correctional Emergency Response Team (CERT) escorted the plaintiff to the intake unit for a change of clothes and medical examination. Id. at ¶35. An incident report says that the plaintiff "refused a decontamination shower." Dkt. No. 34-4 at 8. Medical staff treated him for superficial scratches and a possible bite mark on his lower abdomen and prescribed him an antibiotic. Dkt. No. 32 at ¶37; Dkt. No. 34-5 at 1. The narrative note from this appointment says that the plaintiff "walked down to medical w/o [without] difficultly [*sic*]." Dkt. No. 34-5 at 2. His speech was "clear," and he told medical staff "that he blacked out but knew the aggresser [*sic*] hit him with a mop bucket, can[']t remember where." Id. Staff noted that "both inmates were sprayed with" OC spray, and the plaintiff's "[f]ace appeared red due to spray." Id. The plaintiff's oxygen saturation was at 100%, and his heart rate was 77 beats per minute. Id. Staff advised the plaintiff to "make medical aware if any symptoms occurs [*sic*]." Id. The medical note does not say that the plaintiff complained of breathing problems or mentioned having asthma. Id. After medical staff cleared the plaintiff, the CERT returned him to the intake area and placed him in an observation cell. Dkt. No. 32 at ¶36.

The plaintiff's medical records do not show that he requested a follow up with medical staff regarding asthma symptoms from the OC spray. The plaintiff

submitted a medical request from December 4, 2021 that says his "right eye [was] blurry an[d] it Been going on for 3 day Feel tender irritateed [*sic*]." Dkt. No. 49-1 at 2. Medical staff was not able to see the plaintiff until December 18, 2021, at which time he "denied needing medical" for his eye. Id.

       3.    *Video Exhibits*

The defendants submitted multiple electronic exhibits of body-worn camera (BWC) and security camera footage from December 2, 2021. Dkt. Nos. 38, 56 (Exhibits F and G). The court summarizes the relevant videos below.

       a.    Officer Trello BWC

Trello's BWC video starts with Trello in what appears to be the center or officer station. Officer Trello exits this area at the 0:10 mark and walks toward the common area of the segregation section of the unit. The plaintiff can be seen straight ahead wearing a white shirt and orange and white striped pants. Another incarcerated person (Brown) is to the right of Trello and appears to be speaking with the plaintiff, who has his heard turned toward Brown. Trello knocks on the window to get Brown's attention. There is no audio until 0:29, so one cannot hear what Trello is saying to Brown. Trello walks to his left to the door immediately next to the plaintiff. Brown has slightly entered the common area and is still talking to the plaintiff. The plaintiff and Brown begin arguing, although it is difficult to discern their exact words. Trello yells, "Brown" and "Brown, step back in." Trello BWC at 0:30–0:43. Brown ignores Trello and repeats, "Come on" and "I'm right here" to the plaintiff. Id. at 0:48–0:53. The plaintiff steps away from the door, and his right hand can be seen in his pants. Id. at 0:50. Brown is a few steps away and begins to posture up. The plaintiff occasionally looks to Trello, seemingly hesitant or uncomfortable. Id. at 0:53–1:12. The plaintiff can be heard saying, "What's up?" or something to that

effect. Id. at 1:02. Trello again yells at Brown to "just step back in and close your door." Id. at 1:05. At 1:15, Trello asks another officer to join him on the third floor, while Brown continues to yell at and taunt the plaintiff. Id. at 1:15–1:34.

At 1:35, Brown walks to the corner of the common area, toward Trello, and reaches down to pick up the plastic holder from a mop bucket. Trello again says Brown's name, but Brown does not respond or acknowledge Trello. When Trello turns back toward the plaintiff, the plaintiff is holding a mop. Id. at 1:41. The plaintiff and Brown begin circling each other. Trello yells, "Both y'all lock in!" but neither incarcerated person stops or acknowledges Trello. Id. at 1:49. Brown throws a trashcan to the side of the common area and continues to walk toward the plaintiff, saying "What you wanna do?" or "What you gonna do?" Id. at 1:52. At 1:58, Brown throws the mop holder at the plaintiff, which glances off the left side of the plaintiff's shoulder or neck area. Brown then approaches the plaintiff, who winds up with the mop handle. Id. at 1:59. The two begin fighting; the plaintiff first swings the mop handle, then both the plaintiff and Brown begin throwing punches at each other. Id. at 1:59–2:01.

At 2:02, Rusch suddenly appears to the right of Trello. He yells, "Hey! Spray, spray spray!" as he deploys the OC spray through the food port of the common area and toward the fight. Id. at 2:02–2:06. The spray appears to hit both the plaintiff and Brown, but they continue fighting without any apparent effect. Id. Rusch radios, "OC deployed, OC deployed." Id. at 2:07. Brown gains the advantage in the fight and throws the plaintiff to the ground. Id. at 2:07–2:10. Rusch yells, "We're done!" and "Hey!" while Trello yells at Brown and the plaintiff to "Stop fighting now!" Id. at 2:11–2:16. The plaintiff regains his footing and continues throwing punches at Brown, who rips the plaintiff's shirt off his

9

upper body. Id. At 2:16, Rusch again puts the OC canister through the food port and deploys it towards the plaintiff and Brown, thoroughly saturating Brown's left side. Id. at 2:16–2:20. He yells, "OC spray, spray spray!" Id. The plaintiff and Brown continue to fight, unabated. Rusch yells at them to "Lock down" and "Lock down now!", also to no effect. Id. at 2:20–2:30. The officers continue yelling commands for the plaintiff and Brown to lock down, but they continue fighting. Id. At 2:29, a voice is heard saying what sounds like, "Hey, security [inaudible]." When the camera pans back to the common area, it appears the plaintiff is mouthing something. Id. at 2:29–2:32. The court cannot say with certainty whether it is the plaintiff talking or what this person is saying.

At 2:39, Rusch again attempts to use the OC spray through the food port. Only a small spray comes from the canister, but it appears to hit the plaintiff in the face. Id. at 2:39–2:40. The plaintiff turns his head to the right and puts up his right arm in an apparent sign of surrender. Id. at 2:40–2:43. He mouths something to Rusch, but his words are not audible or discernible over Rusch repeatedly shouting, "Lock down!" Id. Brown is holding the plaintiff's left arm and continues to swing at him, pulling him around the common area. Id. at 2:44–3:00. The officers again yell at Brown to lock down, but Brown continues to swing at the plaintiff and push and pull him around the common area and into the windows. Id. It again looks like the plaintiff tries to say something to the officers, but he cannot be heard over the officers' shouting. Id. The officers begin coughing and hacking from the spray, and the commotion of other officers and incarcerated persons talking fills the area. Id. at 2:58. Another officer tells Trello, "Spray again." Id. at 2:59.

At about 3:04, Trello puts his arm through the food trap door and yells "Spray!" as he deploys another burst of OC spray at the plaintiff and Brown. Brown and the plaintiff wrestle in front of Trello, against the food port door and window. Id. at 3:04–3:28. Multiple officers repeatedly yell at both the plaintiff and Brown to lock down. Id. The officers' coughing and hacking intensifies. At 3:28, Brown swings a final time at the plaintiff before releasing his arm. An officer is heard telling Trello to "Take the pin out" of his canister of OC spray. Id. at 3:30. Brown and the plaintiff step away from each other and head to different corners of the common area. Id. at 3:30–3:35. Trello does not deploy the spray again. The plaintiff heads towards a door labeled "307 OR 6," and officers are heard yelling, "Open six!" Id. at 3:37. The door opens, and the plaintiff leaves the common area. Id. at 3:40–3:43. He can be seen wiping his face with the t-shirt that Brown had pulled off him. Brown continues standing in the corner of the common area as officers cough, hack and yell to open certain doors. Id. at 3:46–4:27. At 4:37, an unidentified female officer asks, "Where's Johnson?" Trello or another officer responds that he has gone "back to his dayroom." Id. at 4:29–32.

The plaintiff is not seen again until 4:51, when Trello pans toward the plaintiff's dayroom. The plaintiff is wiping his face with his t-shirt, which is in his right hand. He has his hands on his hips and paces this small area for the next minute. Id. at 4:52–5:59. He does not appear to be struggling to stand or breath, though he briefly doubles over at 5:59 before Trello turns in a different direction. Trello turns back towards the plaintiff at 6:07, and he is again standing upright. The plaintiff says something inaudible to another officer standing outside of his dayroom window, and the officer responds, "I know!" Id. at 6:14. This officer tells Trello, "He can't breathe. Don't close it." Id. at 6:18–

6:20. The plaintiff continues pacing around his area. The other officer asks

him, "Let me see your mouth." <u>Id.</u> at 6:57. The plaintiff shrugs his shoulders

and says something else inaudible to the officer as he continues to pace. <u>Id.</u> at

6:58–7:02. Trello returns to the officers' station, and the video ends. <u>Id.</u> at 7:22.

          b.    Officer Rusch BWC

      The video from Rusch's BWC is the shortest of the videos at only 3:10 in

length. It begins with Rusch in the officers' station, where Trello's video began.

There is no audio on the video until 0:29, as Rusch takes off running toward

the common area where the fight is occurring. He runs up to the door with the

food chute, pushes his arm through the chute and deploys the OC spray while

yelling, "Hey! Spray, spray spray!" Rusch BWC at 0:29–0:34. This video shows

the fight much the same as seen on Trello's BWC video. Rusch sprays the

plaintiff and Brown a second time with a two-second burst. <u>Id.</u> at 0:44–49. He

yells at the plaintiff and Brown to lock down before briefly walking into the

officers' area to open a door for other officers. <u>Id.</u> at 0:50–1:04. The same voice

heard on Trello's BWC video can be heard saying, "Hey, security [inaudible]."

<u>Id.</u> at 0:58–1:00. Rusch returns to the common-area door, shakes the OC

canister and again attempts to use it through the food chute. <u>Id.</u> at 1:06–1:10.

The spray makes only a faint sound and seems not to have any effect. <u>Id.</u> at

1:07–1:14. Rusch and Trello repeatedly yell at the plaintiff and Brown to stop

fighting and to lock down. <u>Id.</u>

      At 1:21, Rusch returns to the officers' station. He can be heard saying,

"That's spent" as he disposes of the used OC canister. <u>Id.</u> at 1:21–1:27. Rusch

descends the spiral staircase in the middle of the officers' station, retrieves a

new OC canister and returns to the common area where Trello is watching the

plaintiff and Brown continue their fight. <u>Id.</u> at 1:28–1:52. Between labored

breaths, Rusch calls to Trello and hands him the new OC canister. Id. at 1:52–1:57. Rusch can be heard coughing and hacking, and he retreats to the officers' station. Id. at 1:58–2:10. Rusch turns to his right, and the plaintiff can be seen back in his dayroom, having disengaged from the fight with Brown. Id. at 2:10–2:13. Rusch spends the remainder of the video in the officers' station, coughing, hacking and occasionally spitting.

<blockquote>c.    CERT Officers</blockquote>

The defendants submitted videos from Officers Jacob Thomas (or Thomas Jacob) and Seth Peterson, who were part of the CERT team that escorted the plaintiff to his medical examination and into an observation cell. Dkt. No. 32 at ¶¶44–45. These videos show the same events during the same approximately twenty-five-minute span of time. Id. The court will not separately summarize both videos because they show the same events. The court will focus on the BWC from Officer Jacob because the audio of that video is slightly louder, and the plaintiff can be heard a bit more clearly.

These videos begin by showing the CERT traveling to the area of the fight, arriving outside the plaintiff's dayroom area. Thomas Jacob BWC at 1:48. The officers order the plaintiff to lock in his cell before entering to restrain him for transport for his medical examination. Id. at 1:48–2:37. At 2:38, the plaintiff declines a decontamination shower, saying "I don't need no shower. I'm good." The lead officer explains that the CERT will take the plaintiff for a decontamination shower and a medical examination while they clean the common area where the officers deployed the OC spray. Id. at 2:40–2:51. The plaintiff protests that he "didn't do shit," but he complies with the CERT without incident. Id. at 2:52. The officer tells the plaintiff that they will bring him back up to his cell "in an hour or two." Id. at 2:55. The CERT enters the

plaintiff's cell and applies restraints to his hands and ankles while he lays face-down on his bed. Id. at 3:18–4:25. The plaintiff again says that he "didn't do shit," id. at 3:54, but he does not resist or impede the CERT. The plaintiff walks by the camera at one point. Id. at 4:31–4:35. He sighs as he walks by and slightly shakes his head. Id. His face is somewhat red, and there is a scrape along his left side just above his hip bone. Id. The CERT escorts the plaintiff to an elevator to a lower level. The CERT walks the plaintiff at a brisk pace, but the plaintiff does not appear to struggle with the walk or have difficulty breathing. At 5:10, the plaintiff says, "That shit burns" in response to an officer again instructing him that they are taking him for a medical evaluation. Another officer explains that they will take him for a decontamination shower to avoid medical staff being exposed to the OC spray. The plaintiff again responds, "That shit burns." Id. at 6:30. The plaintiff occasionally sniffles, but does not appear to be distress or struggling to breathe.

The CERT takes the plaintiff to a room to change into a clean uniform. One officer asks him if he was "hit in the face at all" with OC spray, which the plaintiff denies. Id. at 8:07–8:17. He again declines a decontamination shower and says he was able to wipe the spray from his face with his shirt. Id. at 8:18–8:43. He agrees to take a new uniform and notes the scrape on his left side, saying that he wants to get "this shit checked out on [his] side." Id. at 8:43–8:46. Another officer asks, "Did the OC hit you at all, anywhere?" Id. at 8:48–8:50. The plaintiff responds something to the effect of, "No, it rolled off his shirt" or "No, I think it rolled off his shirt." Id. at 8:50–8:52. Another officer can be heard on Officer Petersen's video again asking if the plaintiff wants a decontamination shower because his "shoulders look pretty red." Seth Petersen

BWC at 9:06. The plaintiff responds, "Yeah, I'm good, Sergeant. You know, I got sprayed before, and that shit [inaudible—sounds like 'is the worst']." Id. at 9:08–9:13. The CERT removes the plaintiff's restraints so he can change into a clean uniform, then reapplies the restraints and takes him to the medical unit. Thomas Jacob BWC at 8:57–13:40.

The two videos from the CERT members show different parts of the plaintiff's medical evaluation because Jacob remained outside the examination room for the first portion of the evaluation. Id. at 13:40–15:23. The video from Petersen's BWC shows the first part of the plaintiff's medical examination. Seth Petersen BWC at 13:08. The plaintiff asks Petersen if he has "a bite mark or something" on his neck. Id. at 13:09. He explains his injuries to the lead officer, but he declines having any issues on his face or eyes, saying "That's all he was doing, scratching and biting like a girl." Id. at 13:18–13:42. The plaintiff explains to the nurse what happened, explaining that he was "trying to get [his] tray" when Brown "came out and started swinging." Id. at 13:52–14:09. At 14:29, a second nurse wheels a blood-pressure cuff to the plaintiff to take his vitals.

At 14:50, the lead officer directs Jacob to enter the room and flank the plaintiff on his left side. Jacob's BWC video shows him entering the examination room and standing to the plaintiff's left side. Thomas Jacob BWC at 15:24–15:30. The nurse asks the plaintiff if Brown hit him with the mop bucket. Id. The plaintiff responds, "I don't remember, I just blacked out." Id. at 15:30–15:33. The nurse asks if the plaintiff *passed* out, but he corrects her and says, "I said I just blacked out" and forgot what happened. Id. at 15:37–15:43. The plaintiff explains that Brown scratched him but did not really hit him, and that the mop bucket hit him on the left side of his neck. Id. at 15:54–

16:08. Another nurse takes the plaintiff's blood pressure. Id. at 15:38–16:16. The nurse asks the plaintiff if Brown punched him, but the plaintiff says Brown scratched him and "was trying to touch on [the plaintiff]." Id. at 16:50–16:56. The plaintiff (with assistance from CERT officers) shows the nurse the scratches on his side, neck and back, including what he believes is a bite mark on his lower left side. Id. at 17:00–18:08. The nurse asks the plaintiff if he feels pain anywhere, and the plaintiff denies being in pain. Id. at 18:29–18:33. She treats the plaintiff's injuries with a sterile pad on which she sprays a substance that she tells the plaintiff will not burn. Id. at 19:00–21:17. The plaintiff explains that he has another possible bite mark at the top of his back, and he suspects that Brown "was trying to rape [him] or something." Id. at 20:36–20:40. The plaintiff is not gasping, struggling to breathe or showing any signs of labored breathing during the medical examination.

The lead officer again explains that he will have the plaintiff returned to his cell once jail staff can clean up the common area. Id. at 21:24–21:29. The CERT then escorts the plaintiff out of the medical unit and into an observation cell. Id. at 21:29–23:11. As he passes other incarcerated persons in the adjoining cells, the plaintiff laughs and says something that is not discernible. Id. at 23:00–23:09. The plaintiff complies with orders to lay face-down, but an officer tells the other CERT members that they have taken the plaintiff to the wrong cell, the one designated for Brown. Id. at 23:45–23:47. The CERT lifts the plaintiff off the bed and takes him to "OBS 2," where they remove his restraints. Id. at 23:50–25:04. The video from Petersen's BWC concludes shortly after Jacob's, showing the officers leave the observation cell. Seth Petersen BWC at 25:00–25:10.

### d. Security Camera Footage

The plaintiff asserts that he did not receive the security camera footage. Dkt. No. 50 at ¶41. He attached a memorandum dated August 21, 2023 addressed to him from a member of the institution staff; the memorandum that says that the files in Exhibit G (which contains the security camera footage) "again" would not open or play on the stand-alone computer used for exhibit review in Waupun Correctional Institution, where the plaintiff is incarcerated. Dkt. No. 49-1 at 15; <u>see also</u> Dkt. No. 48 (letter from the plaintiff to the court, received on August 15, 2023, indicating that the plaintiff had documents from the Waupun records office stating that a USB thumb drive did not open all documents and a CD did not play all documents).[1] The memorandum explained that discovery needed to be compatible with viewing on a computer running Microsoft Windows, without any special software or viewers. <u>Id.</u>

The deadline for the parties to complete discovery was July 24, 2023. Dkt. Nos. 22, 27. Summary judgment motions were due August 29, 2023. Dkt. No. 22. Normally the court would have expected the plaintiff to file a motion to compel—or other motion about any problems with discovery—before July 24, 2023. But the defendants filed their summary judgment motion on June 23, 2023—two months early and *a month* before the deadline for completing discovery. The court received the plaintiff's letter mentioning trouble with viewing video footage on August 15, 2023, and the August 21, 2023 letter from

---

[1] On October 2, 2023, the court received a letter from defense counsel stating that he was sending the court a thumb drive with new copies of the security camera videos. Dkt. No. 56. Counsel says that he is "copying Plaintiff on this letter and will enclose a duplicate copy of the USB thumb drive along with it." <u>Id.</u> at 2. The plaintiff has not responded to defense counsel's letter or stated whether he received the thumb drive or whether he has since been able to view the security camera videos.

the institution staff member indicates that the staff had twice tried to play the videos for the plaintiff, without success. Dkt. No. 49-1 at 15. Because the defendants filed their summary judgment motion before both the discovery deadline and the summary judgment motion deadline, the plaintiff did not have the opportunity to advise the court of the problems viewing the security camera footage until after the defendants had filed their summary judgment motion. For that reason, the court has not considered the security camera videos in deciding the motion.

## II.     Discussion

### A.     Summary Judgment Standard

A party is entitled to summary judgment if he shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To defeat a motion for summary judgment, the non-moving party (here, the plaintiff) must provide more than assertions, allegations or denials; the plaintiff instead "needs to come forward with *evidence*" demonstrating his entitlement to relief that would be sufficient to "support a jury's verdict in [his] favor." Beatty v. Olin Corp., 693 F.3d 750, 754 (7th Cir. 2012); see Cooper v. Haw, 803 F. App'x 942, 946 (7th

Case 2:22-cv-00849-PP   Filed 10/27/23   Page 18 of 33   Document 57

Cir. 2020) (explaining that "argument alone is insufficient to avoid summary judgment").

      B.    <u>Fourteenth Amendment</u>

As the court explained in the screening order, the court analyzes the plaintiff's claim as a claim that the defendants used excessive force against him. Because the plaintiff was a pretrial detainee at the time of the events, the court reviews his excessive force claim under the Fourteenth Amendment. <u>See</u> <u>Hardeman v. Curran</u>, 933 F.3d 816, 821–22 (7th Cir. 2019); <u>Kingsley v.</u> <u>Hendrickson</u>, 576 U.S. 389, 397 (2015). Under the Fourteenth Amendment, the plaintiff must show "that a defendant's conduct was 'objectively unreasonable.'" <u>Kemp v. Fulton County</u>, 27 F.4th 491, 495 (7th Cir. 2022) (quoting <u>Hardeman</u>, 933 F.3d at 824). Stated differently, he must show that the defendants' actions were not "'rationally related to a legitimate non-punitive governmental purpose'" or that they were "'excessive in relation to that purpose.'" <u>Hardeman</u>, 933 F.3d at 822 (quoting <u>Kingsley</u>, 576 U.S. at 398).

Determining whether an officer's use of force was objectively unreasonable requires the court to look at "the 'facts and circumstances of each particular case.'" <u>Kingsley</u>, 576 U.S. at 397 (quoting <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989)). The court must judge the reasonableness of a particular use of force "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." <u>Id.</u> The court must "focus on the totality of facts and circumstances" that the defendants faced and "gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." <u>Williams v. Ortiz</u>, 937 F.3d 936, 942 (7th Cir. 2019); <u>see also</u> <u>Graham</u>, 490 U.S. at 397 (explaining that the court must determine "whether

the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation"). The proper application of this standard requires consideration of the following factors:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

Kingsley, 576 U.S. at 397. This list is not exhaustive, but it illustrates some of the "objective circumstances potentially relevant to a determination of excessive force." Id.

C.    Analysis

As the court explained above, only the defendants filed proposed findings of fact. The defendants also provided several video exhibits showing the events of December 2, 2021. The plaintiff disputes many of the defendants' proposed findings of fact, but did not properly support most of those disputes with record evidence. Some of the plaintiff's disputes contradict the defendants' characterization a viewer can see or hear on the video exhibits, but he does not question the authenticity of the videos. Because the videos are undisputed and show the events in question, the court will analyze the claims in the amended complaint based on what the videos show. The court will disregard either party's version of the evidence that is inconsistent with the video evidence. See Scott v. Harris, 550 U.S. 372, 380–81 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

1.    *The Officers' Use of Force*

It is undisputed that on December 2, 2021, the plaintiff and Brown got into a fight when Brown entered the common area of the segregation unit while the plaintiff was retrieving his meal tray. It is undisputed that Brown initiated the fight by throwing a plastic mop bucket at the plaintiff, and then the two engaged and swung at each other. It is undisputed that Rusch and Trello deployed OC spray through the food port of the segregation common area several times, hitting at least Brown with the spray. It is undisputed that the plaintiff and Brown continued fighting after the first two or three spray attempts before disengaging after Trello used OC spray. It is undisputed that the plaintiff immediately was treated for scratches and suspected bite marks from the fight, but he was not treated for asthma, difficulties breathing or issues with his eyes.

The court noted in the screening order that the fight gave the officers "a non-punitive reason for spraying the plaintiff and the attacking incarcerated person with the chemical spray." Dkt. No. 17 at 7. The court explained that, if the plaintiff's version in the amended complaint was correct—that the officers decided "to spray the plaintiff and his attacker instead of taking other means to stop the 'fight,' despite knowing that the plaintiff has asthma"—then the officers may have acted unreasonably and "excessive[ly] in relation to the nonpunitive purpose of stopping the fight." Id.

The undisputed facts, including the videos of the events of December 2, 2021, show that the amended complaint's version of the events is not correct. First, the amended complaint alleges that another incarcerated person (Brown) attacked the plaintiff and frames the plaintiff as a non-participant in the "attack." But the videos show that the plaintiff and Brown first exchanged

words before squaring up and then engaging and fighting, though Brown *does* appear to be the aggressor and initiator. The plaintiff nonetheless fought back; he was not merely a passive victim of an attack. This is an important distinction because it changes the "facts and circumstances" that the officers faced at the time of the events. Williams, 937 F.3d at 942. They were trying to stop a *fight* between two incarcerated persons, not an *attack* by one incarcerated person upon another.

Second, also contrary to the amended complaint's allegations, at no point in any video can one see or hear the plaintiff telling the officers that he has asthma and not to use the OC spray on him. One cannot hear the plaintiff saying, "I have asthma, don't spray me" before or during the fight or before the officers deployed the OC spray. The amended complaint alleges that as the plaintiff "was being attacked" he "managed to say don[']t spray I have ast[h]ma." Dkt. No. 16 at 3. But the video shows that the plaintiff did not turn his head toward the officers as Brown approached him, threw the mop bucket at him or began to fight with him. The fight began so quickly that the plaintiff had no time to speak before Brown was charging him. Just as quickly as the fight began, Rusch appeared, put his arm through the food chute and deployed the first burst of OC spray. There was no time in these few seconds where the plaintiff turned to say anything to the officers or where he had the opportunity to do so. He was defending against Brown's advances and swinging the mop handle at Brown.

The plaintiff may have turned to say something to the officers during a moment in the fight, after Rusch had twice deployed OC spray. Trello BWC at 2:29–2:32; Rusch BWC at 0:58–1:00. One can hear a voice, but the voice is difficult to understand and the listener cannot be certain what the voice said.

The view from Trello's video looks to the plaintiff, who may be mouthing something. But the voice sounds somewhat louder on Rusch's video, even though Rusch had walked several feet away from the common area. This suggests it was another incarcerated person—not the plaintiff—whose voice is heard. Even assuming the plaintiff is the voice heard on the video, it sounds like he was saying, "Hey, security, I/we want" something about rights, a group or a room. Although the court cannot be sure of the exact words, the court can reasonably conclude that none of the words are or sound like "don't," "spray" or "asthma." The video evidence refutes the allegations in the amended complaint that the plaintiff told the officers at any point, much less multiple times, that he has asthma and not to use OC spray on him. See Scott, 550 U.S. at 380.

Even if the plaintiff said any of those things to the officers during the fight, the video evidence does not support the conclusion that the officers could hear the plaintiff, because they were constantly shouting about deploying the spray, shouting at Brown and the plaintiff to lock down and stop fighting and shouting at other incarcerated persons to lock down. The cacophonous nature of the minutes during the fight would not have allowed clear communication between the plaintiff and the officers. Rusch was running around the officers' station, opening a door for other officers and retrieving a new canister of OC spray. Trello remained at the common area door but continuously shouted at Brown and the plaintiff to disengage. No reasonable jury could conclude that in these circumstances, the officers would have heard the plaintiff say something about his asthma.

Similarly, one does not hear the plaintiff saying anything about being unable to breathe or having difficulty breathing. The only time any person mentions the plaintiff being unable to breathe is when an unknown officer tells

Trello not to close the plaintiff's cell door because "he can't breathe." Trello BWC at 6:18–6:20. One can see the plaintiff pacing in circles around his space, not doubled over or in apparent distress, though apparently he either told the unknown officer that he was having difficulty breathing or the unknown officer saw something that gave him reason to believe that the plaintiff was having trouble breathing. But this is about three minutes after the fight had ended and after the plaintiff had returned to his dayroom, not before the fight or as it began. The officer did not say that the plaintiff could not breathe because he was experiencing symptoms of asthma. The plaintiff briefly hunched over a few times between pacing, but he remained in that hunched-over position for only a second or two each time. He did not appear to be struggling to breathe, gasping for air or otherwise suffering ill effects to his lungs or to his breathing from the OC spray.

The evidence, including the videos of the fight, does not support a claim that the plaintiff told the officers not to use OC spray and that they unreasonably used the spray anyway. The evidence provides support for the officers' use of OC spray to stop Brown and the plaintiff from fighting. The defendants argue that each of the Kingsley factors weighs in favor of the officers and their actions in deploying OC spray to stop the fight. Dkt. No. 33 at 13–15; see Kingsley, 576 U.S. at 397. The court agrees with the defendants regarding the factors:

> a. "the relationship between the need for the use of force and the amount of force used"

The court explained in the screening order that the officers appeared to have had a non-punitive reason to use force and deploy OC spray—their belief that the plaintiff and Brown were fighting. The videos confirm that the two were fighting; that is, the officers were not trying to stop an attack by one

incarcerated person on another person who was not engaging. The officers repeatedly told Brown to lock down and, once Brown and the plaintiff started fighting, told them both to stop fighting and return to their cells. Brown and the plaintiff disobeyed those orders and continued to fight. The Seventh Circuit has "discussed how important it is that prisoners follow orders." Lewis v. Downey, 581 F.3d 467, 476 (7th Cir. 2009) (quoting Soto v. Dickey, 744 F.2d 1260, 1267 (7th Cir. 1984)) ("'Orders given must be obeyed. . . . When an inmate refuse[s] to obey a proper order, he is attempting to assert his authority over a portion of the institution and its officials. Such refusal and denial of authority places the staff and other inmates in danger.'").

By refusing to obey the officers' orders, both the plaintiff and Brown invited the use of force to regain compliance and order and to protect jail staff and other incarcerated persons. The officers did not respond by using deadly force or more force than needed to stop the fight and restore order. They did not rush in with tasers—although that response may have been warranted, see Lewis, 581 F.3d at 477 (citing cases)—or deploy firearms. They used an incapacitating agent for its designed purpose—to incapacitate the fighting persons and gain compliance. The situation *might* be different if, as the amended complaint alleges, the plaintiff had been attacked by Brown. In that scenario, it might have been unreasonable for the officers to spray the plaintiff as a non-participating victim (assuming they could spray Brown without spraying the plaintiff). But the videos show that is not what happened. Both the plaintiff and Brown disobeyed orders and fought one another, and the officers used the spray the stop the fight and gain compliance from *both* the plaintiff and Brown. No reasonable jury viewing the video evidence could

conclude that the officers lacked justification to use force to stop the fight or that their use of force was disproportionate to the escalating situation.

b.    "the extent of the plaintiff's injury"

The amended complaint alleges that the officers sprayed the plaintiff "in the face and eyes" and that they sprayed him "right in the eyes." Dkt. No. 16 at 2–3. The plaintiff alleges that he must wear glasses because of "the dam[a]ge that was done to [his] eyes." Id. at 4. The video shows that Rusch's third use of spray may have caught the plaintiff in the face or eyes. Trello BWC at 2:39–2:40. But immediately after the fight, the plaintiff twice told CERT officers that the spray *did not* hit him at all, much less in the face or eyes. Thomas Jacob BWC at 8:07–8:17, 8:48–8:50. During his medical examination, the plaintiff did not say anything to the nurse about his eyes being irritated or uncomfortable, and neither the nurse nor CERT members made any note about his eyes showing irritation. In his response to the defendants' proposed findings of fact, the plaintiff asserted that it was Brown "putting his finger in [the plaintiff's] eyes which cause [him] to wear glasses." Dkt. No. 50 at ¶37. That suggests that it was the fight with Brown, not the officers' use of OC spray, that caused the eye irritation of which the plaintiff complained two days after the fight. See Dkt. No. 49-1 at 2. The videos and other evidence in the record refute the amended complaint's allegations that the officers' use of OC spray damaged the plaintiff's eyes. See Scott, 550 U.S. at 380.

The video evidence also confirms the nursing note from the plaintiff's evaluation that he did not tell medical staff during the examination that he has asthma or that he was having trouble breathing. The plaintiff did not appear in distress during his medical evaluation and showed no signs of asthma—he did not gasp for air, struggle to breathe or even breath out of his mouth. He

occasionally sniffled but did not hack, cough or gasp (like the officers did repeatedly after Rusch and Trello deployed the OC spray into the common area). He denied being in pain or hurting anywhere. He did not say anything to the nurse about asthma or having difficulty breathing from the OC spray. The undisputed evidence shows that the officers' use of the OC spray did not cause serious or significant injury to the plaintiff.

<blockquote>
c. "any effort made by the officer to temper or to limit the amount of force"
</blockquote>

Before Rusch appeared at the common area door to deploy the first burst of OC spray, Trello repeatedly had yelled at Brown to lock down and had ordered both the plaintiff and Brown to return to their cells and lock down. Trello and Rusch repeated those orders and their orders to stop fighting as the plaintiff and Brown continued to fight. The officers did not continuously use OC spray; they used it intermittently, giving the plaintiff and Brown the opportunity to stop fighting and separate without further use of force. When the plaintiff and Brown continued to engage, the officers used successive, brief bursts of OC spray in an attempt to stop them. The officers did not use a continuous, non-stop burst of spray. Nor did they continue to spray the plaintiff and Brown after they finally disengaged and separated.

<blockquote>
d. "the severity of the security problem at issue" and "the threat reasonably perceived by the officer"
</blockquote>

As the court noted above, a fight between incarcerated persons is a serious issue for both institution security and safety of the incarcerated persons and jail staff. See Lewis, 581 F.3d at 476; Jeffery v. Sobek, No. 22-cv-123-pp, 2022 WL 10073539, at *3–4 (E.D. Wis. Oct. 17, 2022). The videos show that Brown is a significantly larger person than the plaintiff. Brown began the fight by throwing a plastic mop bucket at the plaintiff, and the

plaintiff responded by swinging a wooden mop handle at Brown. During the fight, Brown occasionally took the plaintiff down to the ground and attacked him from above. When the plaintiff regained the advantage, he threw several punches down at Brown's face or head. The two continued to fight despite the first three or four bursts of OC spray, brawling around the common area. The video provides ample evidence that the officers reasonably perceived a serious threat to institutional security and to the plaintiff and/or Brown the longer the fight continued, given the size disparity, the use of weapons and the intensity of the fight.

e. "whether the plaintiff was actively resisting"

A reasonable jury could conclude that the plaintiff was not actively resisting the officers' commands. Before the fight began, Trello ordered Brown (not the plaintiff) to lock down because Brown was not supposed to be in the common area. The plaintiff rightfully was in the common area to retrieve his meal tray. Once the plaintiff and Brown began to square up and circle each other, however, Trello ordered them both to lock down. They ignored those orders and begin fighting. The plaintiff asserts that he was merely defending himself during this incident and was not the instigator. That may be correct, but the video shows him continuing to throw punches and fight Brown when Brown was down. He did not attempt to leave the common area or disengage until the officers deployed several rounds of OC spray. After the third use of OC spray, the plaintiff put up one arm in what could be seen as a sign of surrender. But Brown had the plaintiff's other arm and pulled him in to continue the fight.

On its own, the fact that the plaintiff attempted to disengage and obey the officers' orders after the fight had begun does not mean the officers'

28

continued use of OC spray was unreasonable. The officers remained confronted with a fight between two incarcerated persons that could result in significant bodily harm if not stopped. Had the officers not continued to use OC spray to stop the fight, it is possible one or both of the incarcerated persons could have suffered worse harm than they did.

The videos show the extent and intensity of the incident between the plaintiff and Brown, which was not merely an attack but a fight between two incarcerated persons. This evidence provides ample justification for the officers' use of OC spray, which itself was not a significant use of force. No reasonable jury viewing the videos of the fight could conclude that the officers used excessive or unreasonable force or that the officers' use of force was excessive in relation to the purpose of stopping the fight.

### 2. The Officers' Knowledge of the Plaintiff's Asthma

The amended complaint alleges that the officers knew before the fight began on December 2, 2021 that the plaintiff suffers from asthma and uses an inhaler. Dkt. No. 16 at 3. But the evidence in the record does not support these allegations.

The plaintiff notes that the jail had his medical records because the Florida Department of Corrections had faxed them to the jail. The plaintiff insists that those medical records demonstrate his history of asthma and the medication he was provided for that condition. Dkt. No. 50 at ¶¶10, 37. But he does not cite any specific page of his medical records showing that at the jail, he was prescribed anything to treat his asthma. One page of his exhibits includes what appears to be a prescription for the medication Xopenex on December 12, 2017, while the plaintiff was in the custody of the Florida Department of Corrections. Dkt. No. 49-1 at 8. But there is no evidence that on December 2,

2021—four years later—either defendant had viewed the Florida medical records, had spoken with medical staff about the plaintiff's asthma or was aware that he suffers from asthma and might react harshly to OC spray. That the jail had the plaintiff's Florida medical records does not establish a genuine dispute of fact about whether Rusch or Trello were aware that the plaintiff had asthma when they used OC spray to stop the fight between him and Brown.

The plaintiff's medical records from the jail also show that the jail did not provide him an inhaler or any medication for asthma. The plaintiff reported during his July 2021 medical screening that he suffers from asthma, but he did not report taking any medication for that condition. Dkt. No. 34-2 at 1. The plaintiff's medical records show that the only medication the jail provided the plaintiff was acetaminophen and only for about a week from November 28, 2021 through December 6, 2021. The plaintiff provided the court with a form showing that he was receiving Albuterol for his asthma as of July 11, 2022, id. at 4, but that form does not say when the plaintiff began using Albuterol. There is no evidence that he received anything for asthma between his July 2021 booking and his July 2022 medical screening. Because the evidence shows that the plaintiff *was not* receiving medication or an inhaler for his asthma at the jail in December 2021, the allegation in the amended complaint that he "always saw the nurse for [his] inhaler" is unsupported. Dkt. No. 16 at 3. The allegation that the officers knew the plaintiff had asthma based on his nurse visits for the use of an inhaler also is unsupported by the evidence.

Even if the plaintiff had produced or identified evidence establishing that the officers knew he had asthma when they used OC spray on December 2, 2021, the court explained above that several factors justified their use of OC spray to stop the fight. This court recently held (albeit in a screening order)

that jail officials' use of OC spray on an asthmatic pretrial detainee in similar circumstances did not constitute a Fourteenth Amendment violation. See Jeffery, 2022 WL 10073539, at *4. The plaintiff in Jeffrey alleged that Milwaukee County Jail officials ignored his concern that he and his cellmate "were having problems and were on the verge of fighting." Id. at *1. He alleged that his cellmate struck him, and the plaintiff violently responded by "smash[ing] his cellmate's head into the wall" and, in the plaintiff's own words, attempting "'to try to brake [sic] and snap his cellmate's neck, to depleat [*sic*] the threat of his cellmate's continuous assault.'" Id. (quoting Complaint, Dkt. No. 1 at 3). Jail officials ordered the plaintiff to stop attacking his cellmate, but he refused. Id. at *2. He alleged that officials opened his cell door and one official "sprayed OC spray in the plaintiff's face, even though he knew the plaintiff has asthma." Id.

This court concluded that, even if jail officials knew that the plaintiff had asthma,

> they would not have had to open the cell and use OC spray if the plaintiff had followed their orders and released his cellmate. Given the severity of the security problem—the plaintiff violently assaulting his cellmate—the amount of force used (non-contact use of a chemical agent), the threat the officers likely perceived (that the plaintiff would severely injure or kill his cellmate) and the fact that the plaintiff refused to follow orders to release his cellmate, as a matter of law their use of OC spray did not constitute excessive force.

Id. at *4.

Those facts are similar to the facts in this case, and the court reaches the same conclusion here. The court explained above that the officers' decision to use force on December 2, 2021 was justified by the intensity and severity of the fight between the plaintiff and Brown, the perceived risk to the safety of the jail and the participants of the fight and the plaintiff and Brown's refusal to

comply with the officers' orders to disengage. The officers used only the amount of force needed to stop the fight, and there is no evidence that the use of force caused serious injury. Even if the officers knew that the plaintiff had asthma—and there is no evidence that they did—the circumstances of the fight justified their use of OC spray on the plaintiff and Brown. No reasonable jury could conclude that the officers' use of force was objectively unreasonable. Officers Rusch and Trello are entitled to judgment as a matter of law on the plaintiff's Fourteenth Amendment claim.[2]

## III. Conclusion

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 31.

The court **DISMISSES** this case. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. R. App. P. 4(a)(5)(A).

---

[2] Because the court is granting summary judgment to the defendants on the merits, it will not analyze their claim that they are entitled to qualified immunity. See Sierra-Lopez v. County, Case No. 17-cv-1222-pp, 2019 WL 3501540, at *10 (E.D. Wis. July 31, 2019) (citing Viero v. Bufano, 925 F. Supp. 1374, 1387 (N.D. Ill. 1996); and Antepenko v. Domrois, Case No. 17-cv-1211, 2018 WL 6065347, at *6 (E.D. Wis. Nov. 20, 2018)).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. <u>See</u> Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. <u>See</u> Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 27th day of October, 2023.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**